**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**July 24, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

BOBBIE JO HOROCOFSKY,

    Plaintiff - Appellant,

v.

CITY OF LAWRENCE, KANSAS;
CHARLES B. COTTENGIM;
KIMBERLEE A. NICHOLSON,

    Defendants - Appellees.

No. 25-3024

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:20-CV-02529-EFM)**
_____

Cheryl A. Pilate, Morgan Pilate LLC, Kansas City, Missouri (Sarah A. Brown, Brown, Curry & Duggan, LLC, Kansas City, Missouri, with her on the briefs), for Plaintiff-Appellant.

Michelle R. Stewart, Hinkle Law Firm, LLC, Lenexa, Kansas, for Defendants-Appellees.
_____

Before **HOLMES**, Chief Circuit Judge, **HARTZ**, Circuit Judge, and **GARCIA**,[*] District Judge.
_____

**HARTZ**, Circuit Judge.
_____

---

[*] The Honorable Matthew L. Garcia, District Judge, United States District Court, District of New Mexico, sitting by designation.

Plaintiff Bobbie Jo Horocofsky alleges that she was raped by a law-school classmate. But officers of the City of Lawrence Police Department (LPD) ended up investigating her for filing a false report, and she was charged on three counts of making false accusations against the alleged rapist. After those charges were dismissed, Plaintiff sued LPD Officers Charles Cottengim and Kimberlee Nicholson (Defendants) and the City of Lawrence under federal civil-rights statutes and state law.[1] Three years into the litigation, she also sought to add a claim that Defendants violated her Fourth Amendment rights by searching her phone.

The district court dismissed all the claims and denied Plaintiff's motion to add a Fourth Amendment claim. On appeal we are asked to review only (1) the dismissals for failure to state a claim of the federal civil-rights claims of malicious prosecution and conspiracy against Defendants, (2) the district court's refusal to allow Plaintiff to amend her complaint, (3) the grant of summary judgment against her on an equal-protection claim against Defendants, and (4) the grant of summary judgment against her on several state-law claims against Defendants and the City. Exercising jurisdiction under 28 U.S.C. § 1291, we largely affirm.

We hold that the malicious-prosecution claim failed to adequately allege that Defendants were responsible for the prosecution; that the conspiracy claim failed to adequately allege that Defendants agreed with anyone to violate Plaintiff's rights; and that Plaintiff did not demonstrate good cause to file an amended complaint after

---

[1] Also sued were LPD Officer Daniel Affalter and the University of Kansas, but the parties have stipulated to their dismissal.

2

the court-ordered deadline for amendments. As for the equal-protection claim, we hold that Plaintiff failed to adequately show that Defendants treated her differently from anyone similarly situated to her or that circumstantial evidence supported an inference of discrimination.

Ordinarily, however, a district court should not rule on state-law claims before it on supplemental jurisdiction after disposing of the federal claims before trial. We therefore remand for the district court to determine whether it should have declined to exercise supplemental jurisdiction over those claims.

## I.     BACKGROUND

Two documents will dominate our discussion: Plaintiff's First Amended Complaint (the Complaint) and the probable-cause affidavit submitted by Officer Cottengim in support of the warrant for Plaintiff's arrest for making false accusations (the Affidavit).[2] For the purpose of providing the background for our discussion, we will rely primarily on the Complaint but supplement it with undisputed facts in the record.

### A.     Factual Background

On September 27, 2018, Plaintiff, a student at the University of Kansas School of Law, went out to drink with fellow students, including Joel Thompson. Thompson

---

[2] The operative complaint, Plaintiff's First Amended Complaint, appears at Aplt. App., Vol. 1 at 86–156. This opinion will reference it simply as the Complaint, and citations to it will provide the page of the Complaint. Similarly, the Affidavit appears at Aplt. App., Vol. 9 at 2363–69, and our citations will provide the page of the Affidavit.

was "the best friend of her on again, off-again boyfriend, Kriston Guillot." Compl. at 10.

Early the next morning she "woke up in a strange bed" naked with "bruises on her body." *Id.* at 9. "[S]he did not initially recognize" the man "in bed with her" but eventually determined that it was Thompson. *Id.* "She knew he'd had sex with her, even though she was far too intoxicated to consent." *Id.* at 9–10.

At around 6 a.m. Plaintiff was about to text her close friend, Courtney Hurtig, when she saw that four hours earlier she had texted her, saying that she had "'fucked up' and 'slept with Joel.'" *Id.* at 10. Plaintiff "had no memory of sending that message." *Id.* Plaintiff had also texted Hurtig: "It's all good . . . this was a fuck up though I literally made him stop having sex and was like oh no what will Kriston say." *Id.* at 13 (cleaned up). Hurtig asked, "What happened to it being gross and he slept with half the law school?! Dirty. Dick." Aff. at 3 (internal quotation marks omitted). Plaintiff responded, "I know . . . maybe I should just start an antibiotic" and "I know! It is gross . . . he's actually really good at sex though." *Id*. (internal quotation marks omitted).

Later that morning Plaintiff returned home and texted Hurtig: "Get here fast -- I'm literally about to have a breakdown." Compl. at 10 (internal quotation marks omitted). When Hurtig arrived, she saw Plaintiff's bruises, noticed that Plaintiff was unusually upset, and suspected that Plaintiff had been raped.[3]

---

[3] In Kansas, rape includes "[k]nowingly engaging in sexual intercourse with a victim . . . when the victim is incapable of giving consent because of the effect of any

The next day Plaintiff's memories began to return. She told Hurtig, "I don't know . . . I don't know if it's rape. I'm so embarrassed," and she texted Hurtig's boyfriend, "I'm pretty sure it was borderline date rape and I have the bruises and statements to prove it." *Id.* at 11–12 (internal quotation marks omitted). After Plaintiff "acknowledge[d] that she may have been raped," Hurtig called the LPD "and sa[id] that her friend [was] ready to report a rape." *Id.* at 12.

LPD Officer Daniel Affalter asked Plaintiff and Hurtig to meet at Lawrence Memorial Hospital. The two women met with Affalter and Defendants. Plaintiff "told Affalter that she had been raped the day before," but "she did not want to press charges." *Id.* at 13.

Plaintiff and Hurtig provided their phones to the officers to examine. Affalter and Defendants saw the texts between Plaintiff and Hurtig and began investigating whether Plaintiff gave a false statement to officers.

Meanwhile, Plaintiff underwent a rape examination with a Sexual Assault Nurse Examiner, although she told the nurse that she did not want the examination results reported to the police. The nurse passed that decision along to the officers.

A few days later, Nicholson and Affalter interviewed Plaintiff at her house. She repeatedly asserted that she did "not want to pursue charges" and "that she fear[ed] doing so could ruin law school and her career." *Id.* at 15–16. Nicholson said to her that the text messages "look[ed] like [Plaintiff] just regrets what had

---

alcoholic liquor . . . , which condition was known by the offender or was reasonably apparent to the offender." K.S.A. § 21-5503(a)(2).

happened." *Id.* at 16. Plaintiff disagreed, explaining that she "'played it off' initially in the text messages with Courtney because she was concerned about protecting her future job." *Id.* (brackets omitted). Nicholson responded that "the detectives' point of view" was that "it happens a lot in college towns, just things like that where females mess up or males mess up and sleep with the wrong person." *Id.* (internal quotation marks omitted). And "it looks like you cheated on your boyfriend and you're like 'Oh, shit,' and then your friend was like 'Well, you were raped,' and that's why we were called. And it happens a lot, and we just like to clear it up so we don't have to do further investigation." *Id.* (internal quotation marks omitted).

Plaintiff "struggled in the aftermath" and met with the University's Title IX office, Office of Institutional Opportunity and Access (IOA). *Id.* at 17. Plaintiff told Affalter, who passed it along to Defendants, that she "met with IOA," "was thinking about making a full statement to the police and potentially pursuing charges against Thompson," and would meet with any officer other than Nicholson. *Id.* (emphasis omitted). Cottengim called an IOA investigator, spoke to a police captain, and began interviewing witnesses, including Thompson, his roommates, and Guillot.

On October 12, Plaintiff told Cottengim that she did not want the criminal or IOA investigation to proceed. She said that she was worried the investigation would jeopardize her future employment and that her doctor "advised her not to continue with the investigation due to the amount of stress it was causing her." *Id.* at 19. Despite telling Plaintiff that the investigation would stop, Cottengim continued interviewing witnesses.

On October 29, Plaintiff met with Officers Affalter and Cottengim and "provide[d] her full account." *Id.* at 22.

### B.    Court Proceedings

On December 5, 2018, Cottengim signed the Affidavit alleging that Plaintiff had falsely reported that she had been raped. The City initiated a criminal complaint against Plaintiff in late January 2019. Several days later, Cottengim requested that she come to the LPD station, where he arrested her. Plaintiff was later charged with two more counts of false reporting.

At a preliminary hearing in June 2019 the state district court "found probable cause to support the charges, relying largely on the correct spelling in [Plaintiff's] early morning text messages to Hurtig, while also failing to note that smart phones all have 'auto correct' and would likely fix any spelling errors." *Id.* at 33.

That October the District Attorney moved to drop the charges, and the district court dismissed all charges with prejudice. Plaintiff promptly filed suit in the United States District Court for the District of Kansas. The district court ultimately entered judgment dismissing all the claims and denying Plaintiff's motion to add a Fourth Amendment claim.

### II.    DISCUSSION

Plaintiff appeals only (1) the dismissal under Fed. R. Civ. P. 12(b)(6) of her claims against Defendants under 42 U.S.C. §§ 1983 and 1985 for malicious prosecution and conspiracy, (2) the denial of her motion for leave to add a Fourth Amendment claim, (3) the grant of summary judgment to Defendants on her equal-

7

protection claim, and (4) the grant of summary judgment to Defendants and the City on her state-law claims.

We begin by addressing the claims dismissed on the pleadings, then discuss her motion to amend, and finally turn to the claims dismissed on summary judgment.

## A. Motion to Dismiss

### 1. *Standard of review*

"We review de novo the district court's ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief." *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022). "In considering whether the complaint's allegations are sufficient, the court first eliminates conclusory allegations, mere labels and conclusions, and any formulaic recitation of the elements of a cause of action." *Id.* (internal quotation marks omitted). Ordinarily, we then "assume the[] veracity" of "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "In conducting this analysis, the court draws all reasonable inferences in favor of the plaintiff." *Bledsoe*, 53 F.4th at 607. We may also consider, however, a document referenced by the complaint if (1) it is attached to or incorporated by reference in the complaint or (2) an indisputably authentic copy is submitted to the court. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Plaintiff has not argued that the copy of the Affidavit in the record is inauthentic or that reliance on it is improper. Thus, we are not bound by the Complaint's description of the Affidavit and may rely on the Affidavit to contradict the Complaint.

When alleging claims under § 1983, "it is particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Accordingly, a complaint should avoid "the collective term 'Defendants.'" *Id.*

## 2.    *Malicious prosecution*

On a § 1983 malicious-prosecution claim the plaintiff must show that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." *Coones v. Bd. of Cnty. Comm'rs of Unified Gov't of Wyandotte Cnty./Kan. City*, 166 F.4th 1, 25 (10th Cir. 2026) (internal quotation marks omitted). The district court dismissed the claim on the first element, holding that Plaintiff did not adequately allege causation. *See Horocofsky*, 2022 WL 1421554, at *24–26. We agree.

"[P]ursuing a malicious prosecution claim against a police officer is 'anomalous'" because "'[t]he principal player in carrying out a prosecution . . . is not police officer but prosecutor.'" *Taylor v. Meacham*, 82 F.3d 1556, 1563 n.8 (10th Cir. 1996) (quoting *Albright v. Oliver*, 510 U.S. 266, 279 n.5 (1994) (Ginsburg, J., concurring)). And often a judge determines at a preliminary hearing whether there is probable cause. *See id.* at 1563–64. Thus, even when police officers "set in motion

9

a malicious prosecution," the chain of causation is ordinarily broken by an indictment or preliminary hearing. *Id.* at 1564.[4]

But officers may be said to cause a prosecution if they prepare an affidavit and (1) "knowingly or with reckless disregard for the truth" include false statements or omit facts in the affidavit, (2) the inaccuracies are material because they are "significant enough to vitiate probable cause," and (3) the statements or omissions "induce the criminal justice system to confine and then to prosecute an innocent defendant." *Pierce v. Gilchrist*, 359 F.3d 1279, 1287, 1293 (10th Cir. 2004) (internal quotation marks omitted); *see Bledsoe*, 53 F.4th at 614; *Taylor*, 82 F.3d at 1562. **"To establish recklessness, there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations,"** *Kapinski v. City of Albuquerque*, 964 F.3d 900, 908 (10th Cir. 2020) (internal quotation marks omitted), not just evidence of "negligence or inadvertence," *Taylor*, 82 F.3d at 1563. "An officer who does not personally know information cannot intentionally or recklessly omit it.**"** *United States v. Pulley*, 987 F.3d 370, 379 (4th Cir. 2021), *see id.* at 377 ("What the officer-affiant *should* have known does not matter if he did not *in fact* know."). To determine materiality, we consider whether the affidavit would still support probable cause after "setting aside the false information" and "examining the affidavit as if the

---

[4] Although Plaintiff suggests that *Taylor* is inapplicable because we were reviewing a summary judgment, we have applied *Taylor* at the motion-to-dismiss stage. *See, e.g.*, *Shrum v. Cooke*, 60 F.4th 1304, 1312 (10th Cir. 2023).

omitted information had been included." *Taylor*, 82 F.3d at 1562 (internal quotation marks omitted).[5]

Plaintiff does not allege that Defendants charged her with any offenses. *See* Compl. at 67–68. And she acknowledges that "*the [state] district court . . . found probable cause to support the charges*" at a preliminary hearing. *Id.* at 33 (emphasis added). Rather, her malicious-prosecution claims against Defendants are predicated solely on alleged defects in Cottengim's Affidavit. We are not persuaded. We consider each alleged error or omission raised in Plaintiff's opening brief on appeal.

To begin with, we do not need to address several "conclusory allegations," which are entitled to no weight. *Bledsoe*, 53 F.4th at 606. These allegations include (1) the complaint that the Affidavit "was full of material and gross omissions, misleading statements, and unsupported claims," Compl. at 25; (2) the assertion that "[h]ad the [A]ffidavit contained accurate and complete information, it would not have supported probable cause to arrest" Plaintiff, *id.* (emphasis omitted); and (3) the claim that Cottengim falsely and misleadingly drew "false causal connections," Aplt. Br. at 28.

We now turn to Plaintiff's assertions that the affidavit contained false statements and then we address her assertions regarding omissions.

---

[5] Plaintiff argues that *Coones*, 166 F.4th 1, is relevant to her theory of causation. But on appeal the defendants in *Coones* did not raise, so we did not decide, causation. *See id.* at 26.

11

Plaintiff has not adequately alleged that Cottengim knowingly or recklessly made materially false statements. Plaintiff points to two statements in the Affidavit that she claims to be materially false: (1) that Cottengim believed Plaintiff and Thompson had consensual sexual intercourse and (2) that Plaintiff reported that she had been raped. We disagree.

First, Plaintiff asserts that Cottengim stated "[t]he false belief that [Plaintiff] was coherent enough to consent to sexual intercourse because of correctly spelled words in her text messages." Aplt. Br. at 27 (internal quotation marks omitted); *see also* Aff. at 6 (Cottengim "believes [Plaintiff] and Joel Thompson were coherent enough to type correctly spelled words and form sentences"). Plaintiff argues that the Affidavit's conclusion was false because phones contain "self-correcting spelling function[s]." *Id.* at 28. But even if Cottengim did draw a mistaken inference from the correctly spelled words, what matters is whether the affiant officer believed what he said he believed. *See Franks v. Delaware*, 438 U.S. 154, 165 (1978) (under the Fourth Amendment, a truthful affidavit "does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct" but "that the information put forth is believed or appropriately accepted by the affiant as true"). It is therefore dispositive that the Complaint does not allege that Cottengim falsely stated what his belief was. And such an allegation would be particularly striking because, according to the Complaint, the state judge who conducted the probable-cause hearing reached the same conclusion as Cottengim, presumably after defense counsel had the opportunity at the hearing to point out the self-correcting features of

the smartphone. *See* Compl. at 33 (the judge "rel[ied] largely on the correct spelling in [Plaintiff]'s early morning text messages to Hurtig, while also failing to note that smart phones all have 'auto correct' and would likely fix any spelling errors").

Second, Plaintiff complains that the Affidavit falsely recounted that Plaintiff "was not sure she wanted to pursue charges" at the hospital on September 29, Aplt. Br. at 27 (citing Aff. at 2) and that on October 10 she told Affalter that she "'want[ed] to pursue charges,'" *id.* (quoting Aff. at 4). She asserts that these statements are false because she "never indicated any desire to pursue charges against Thompson to the police." *Id.* at 28.

But Plaintiff has not explained why her reluctance to bring charges is material when the Complaint alleges, as the Affidavit stated, that Plaintiff "told Affalter that she had been raped." Compl. at 13; *see* Aff. at 2 ("[Plaintiff] reported to Officer D. Affalter, by phone, that she had been raped by [Thompson]"). It is the accusation of rape that formed the basis of the charge against Plaintiff, not her statements regarding whether she wished to pursue charges.

Further, the factual assertions in the Complaint about Plaintiff's attitude toward bringing charges are not materially different from those in the Affidavit. The Complaint alleges that on September 29 Plaintiff was "hesitant" to talk to officers at the hospital but ultimately met with them "so at least the evidence [could] be collected." Compl. at 12. Hurtig told her to go "[e]*ven if* [Plaintiff] d[idn't] want to end up pressing charges." *Id.* at 12 (emphasis added) (internal quotation marks omitted). At the hospital she provided her phone to police officers so that they could

collect evidence. *See id.* at 12–13. And Nicholson ended the conversation with Plaintiff by telling her that "*if* she decided to proceed, she could come down to [the] station later and give [a] full statement." *Id.* at 13 (emphasis added). These allegations fairly imply that, as stated in the Affidavit, Plaintiff was not sure she wished to pursue charges against Thompson.

More importantly, the Complaint alleges that on October 10 Plaintiff told Affalter that she "was thinking about making a full statement to the police and potentially pursuing charges," and she "indicated she was willing to meet with any LPD detective other than Nicholson." *Id.* at 17 (emphasis omitted). To be sure, the Complaint alleges that two days later she "call[ed] Cottengim and t[old] him that she d[id] not want any criminal investigation to go forward" in part because her doctor "advised her not to continue." *Id.* at 19. But to decline to continue, one must have started. The Complaint is inconsistent with the notion that Plaintiff "never indicated" a desire to pursue charges and that the Affidavit was materially false in suggesting otherwise. Aplt. Br. at 28.

In sum, the Affidavit accurately stated that Plaintiff reported she had been raped, the Complaint does not allege that Cottengim lied when he said that he did not believe Plaintiff was raped, and the statements in the Affidavit concerning Plaintiff's willingness to press charges are not materially false.[6]

---

[6] Plaintiff also points out an apparent factual error in the Affidavit: it says that Plaintiff called Nicholson during one conversation, when the Complaint says that it was actually Nicholson who called Plaintiff. *See* Aplt. Br. at 27. But who called whom does not materially change the probable-cause calculus.

14

As for alleged omissions in the Affidavit, (1) one can be disposed of because there was no omission, (2) others can be disposed of because there is no allegation that Cottengim knew the omitted information (so the omission could not have been knowing or reckless), and (3) other omitted information was not material because it could not have affected the evaluation of probable cause.

In the first category, Plaintiff asserts that the Affidavit omitted "[a]ny mention of [her] ongoing medical care . . . after she told detectives that she was suffering from extreme stress." Aplt. Br. at 25. The Affidavit, however, expressly stated, in bold, that Plaintiff "advised she had seen a doctor" and that the doctor "advised her not" to pursue charges against Thompson "due to the amount of stress it was causing her." Aff. at 5.

For several other alleged "omissions," Plaintiff does not assert that Defendants knew (or even should have known) the facts omitted from the Affidavit. The argument in Plaintiff's brief asserts that the Affidavit omitted mention of Plaintiff's medical records, the results from her rape kit, and interviews with her doctors and friends who had evidence of her mental and physical condition after the alleged rape. *See* Aplt. Br. at 25. But Plaintiff never alleges that Cottengim had access to her medical data, so there was nothing to omit. In fact, the Complaint alleges that Plaintiff did not want her medical records disclosed to the police, *see* Compl. at 14, and it suggests that officers did not have Plaintiff's consent to receive her records, *see id.* at 27–28. Likewise, the Complaint does not allege that the rape-kit results existed when Cottengim wrote his Affidavit. So the results could not be "omitted."

15

*See id.* at 28 (alleging that "[t]he rape kit was *eventually* tested during [Plaintiff]'s criminal case" (emphasis added)). Similarly, the Complaint alleges that Cottengim did not interview several of Plaintiff's doctors or friends, *see id.* at 28–29; yet, with only one exception, it does not identify any statement to Defendants by doctors or friends that was omitted from the Affidavit. The one exception is that the Complaint alleges that at the hospital Hurtig told the officers "about [Plaintiff's] emotional distress and physical injuries." *Id.* at 28. But there is no reason to believe that this omission was intentional or reckless, since the Affidavit reported on her distress and quoted a text message from Plaintiff noting her "bruises." Aff. at 2; *see Kapinski*, 964 F.3d at 908 ("[T]he fact that [the affiant] included evidence militating *in favor* of self-defense in the affidavit negates any . . . inference" of recklessness in omitting body-camera footage that could support self-defense theory).

Plaintiff's allegations about her intoxication are similar. She complains that the affidavit omitted her records that would show purchases of drinks and a video from the bar where she was with Thompson, which showed her intoxication. *See* Aplt. Br. at 26. But the complaint did not allege that Cottengim possessed or knew about such records or a video.

Similarly, Plaintiff asserts that the Affidavit omitted evidence that Thompson was "known for taking advantage of young women who'd had too much to drink." Aplt. Br. at 26 (citing Compl. at 4, 26). But the Complaint never alleges, nor does Plaintiff argue on appeal, that *Cottengim* was aware of this reputation, as opposed to,

16

for example, a reputation for having sex with lots of women, which was noted in the Affidavit. *See* Aff. at 2 (Hurtig said that Thompson had a reputation for promiscuity).

Because Plaintiff did not allege that Cottengim knew about any of this information, even if she believes that he "*should* have known" about it, she has not adequately alleged that these omissions were reckless or intentional. *Pulley*, 987 F.3d at 379.

The remaining alleged omissions were immaterial in light of the information provided in the Affidavit. Plaintiff argues that it omitted "[t]ext messages between Thompson and his friends, just prior to the assault, joking that [Plaintiff] appeared intoxicated, demonstrating her obvious inability to consent," but the Affidavit included some texts between Thompson and his friends joking about Plaintiff's intoxication before she left the bar. *Compare* Aplt. Br. at 26, *with* Aff. at 5. Additional texts reiterating that Plaintiff was intoxicated would add nothing to the determination of whether there was probable cause.

Plaintiff next complains that the Affidavit omitted to mention the failure of the officers to investigate her medical data. But the fact that they had failed to conduct such an investigation was not material. After all, the Complaint alleges that Plaintiff did not want her medical records disclosed to the police. We fail to see what inference in her favor could have been drawn from inclusion in the Affidavit of the fact that there was no investigation into something she did not want to be disclosed.

Plaintiff asserts that the Affidavit omitted Plaintiff's statement to officers that "she was concerned about protecting her future job when Nicholson questioned her

17

on October 3." Aplt. Br. at 26. The Affidavit said, however, that on October 12 Cottengim spoke to Plaintiff, who advised him that "she did not want [the investigation] to jeopardize the job offer she received." Aff. at 5. Even if Plaintiff is right that Cottengim knowingly omitted what Plaintiff told Nicholson on October 3, she does not explain how that omission would be material given that the Affidavit noted that she made the same statement nine days later.

Plaintiff also alleges that the Affidavit omitted Thompson's "graphic text messages," which "indicated [Thompson] had harbored a plan to sexually assault her for months." Aplt. Br. at 25.[7] These texts may have "clearly expressed" Thompson's intent to have sex with Plaintiff. *Id.* at 26. And they may have been extremely "crude." *Id.* at 16. But even if they should have been included in the Affidavit as a matter of completeness, their addition would not have been material. As the Affidavit made clear, Plaintiff was intoxicated and Thompson had sex with her. Thompson's expressed intent would have little bearing on whether Plaintiff consented.

Finally, we note that Plaintiff complains about the Affidavit's use of quotation marks and bold type, but she does not explain how this typography could materially alter the existence of probable cause.

---

[7] After observing that Plaintiff "was so fucked up," Thompson texted a friend that he was "bout to see what [Plaintiff] was working with" and was "fucking" Plaintiff just so that Guillot "knows [Thompson] can**."** Compl. at 27 (internal quotation marks omitted). Thompson had previously texted Guillot other "crude texts" about his "intent to have sex with" Plaintiff. *Id.*

In sum, the Complaint does not plausibly allege that Defendants caused her alleged malicious prosecution. Defendants' only involvement was that Cottengim completed an affidavit that was materially correct.[8] Because we resolve this claim on causation, we need not address whether Plaintiff plausibly alleged the other elements of a malicious-prosecution claim.

### 3.    *Conspiracy*

Plaintiff alleges conspiracies in violation of 42 U.S.C. §§ 1983 and 1985(3). Section 1983 provides a cause of action for "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990). And § 1985(3) reaches private conspiracies, but it requires that the conspiracy be "driven by some racial or otherwise class-based discriminatory animus." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227 (10th Cir. 2010) (internal quotation marks omitted), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021). (We need not address whether the Complaint alleges the necessary animus.) "[A] federal conspiracy action brought under either of these statutes requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Id.* at 1227–28.

---

[8] Plaintiff has waived any argument that Defendants caused her prosecution through means other than Cottengim's affidavit, because she failed to develop such an argument in her opening brief. *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is deemed waived").

A conspiracy claim requires "more than conclusory allegations." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998). "Without more, parallel conduct does not suggest conspiracy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007); *see Brooks*, 614 F.3d at 1228. And allegations that "defendants formed an agreement or conspired to engage in lawful activities—including lawful investigative activities" are insufficient. *Frasier v. Evans*, 992 F.3d 1003, 1025 (10th Cir. 2021); *see Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010) (a showing that defendants agreed to investigate plaintiff is insufficient to show conspiracy to maliciously prosecute).

Plaintiff alleges a conspiracy joined by Defendants and the University IOA investigator Kathryn Burns. We agree with the district court that she failed to assert her claims with more than conclusory allegations. *See Horocofsky*, 2022 WL 1421554, at *29. At bottom, Plaintiff's nonconclusory allegations allege only agreement to "engage in . . . lawful investigative activities." *Frasier*, 992 F.3d at 1025.

Plaintiff asserts that Defendants "agree[d] they would target [Plaintiff] for a false report" shortly after meeting her at the hospital and "seeing a handful of text messages." Aplt. Br. at 37 (citing Compl. at 2, 4, 6, 12–13, 15–18, 21–22). The Complaint alleges that the officers "made a snap judgment to reject her account" and "targeted" her instead of Thompson. Compl. at 2, 4. But the underlying factual allegations show only that officers interviewed witnesses, *see id.* at 12, 15–17, 18, 21, 22, and decided to investigate Plaintiff, *see id.* at 6, 13. "[S]howing that

20

[Defendants] 'conspired' to investigate [Plaintiff], which is lawful and part of their duties as law enforcement officers, is a far cry from showing that [Defendants] agreed to . . . maliciously prosecute [Plaintiff] for[] a . . . crime [s]he did not commit." *Grider*, 618 F.3d at 1260.

Nor are allegations that Cottengim "worked closely together" with Burns, or that the two met and shared information, sufficient to show an unlawful agreement. Compl. at 6; *see also id.* at 20, 22–24, 31. Those allegations merely establish that the two worked together to investigate, not that they worked together to *unlawfully* investigate. *See Frasier*, 992 F.3d at 1025. And the fact that Cottengim "met with [Burns] during the investigation" does not mean it "is reasonable to infer" that "they were conspiring with one another" to act unlawfully. *Tonkovich*, 159 F.3d at 533

Finally, Plaintiff alleges that other sexual-assault survivors (identified as Jane Does 1–3) were treated contemptuously by the LPD and its detectives, *see, e.g.*, Compl. at 34–36, and that "some detectives had been cheering that they 'finally got our false reporter'" after charges were brought against Plaintiff, *id.* at 34. But allegations need to specify which identified members of a group did what particular acts. *See* 519 F.3d at 1250. In particular, there is no specific allegation in the Complaint that *Defendants* treated Jane Does 1–3 contemptuously, that they engaged in such cheering, or that they conspired with the unnamed officers.

Thus, the Complaint failed to state a claim for a conspiracy under either § 1983 or § 1985(3).

21

B.      Motion for Leave to Amend

Plaintiff moved to amend her complaint to add a Fourth Amendment claim more than a year after the scheduling-order deadline for amendments.

To amend after such a deadline, a party must show good cause. *See* Fed. R. Civ. P. 16(b)(4). Good cause "may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed. If the plaintiff knew of the underlying conduct but simply failed to raise [the] claims, however, the claims are barred." *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (citation omitted). In particular, parties must show good cause for any delay after they are "on notice that they might need to amend their complaint." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1248 (10th Cir. 2015). They must act *diligently* to amend. *See id.* (holding that district court did not abuse its discretion in finding no good cause to amend four months after notice without an explanation for delay); *Husky Ventures, Inc. v. B55 Invs.*, Ltd., 911 F.3d 1000, 1021 (10th Cir. 2018) (affirming district court's holding that counterclaimant lacked good cause "because it had failed to exercise reasonable diligence in acquiring the supposedly newly discovered information that formed the basis of its motion to amend"); *Gorsuch,* 771 F.3d at 1240 ("In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite the movant's diligent efforts" (brackets and internal quotation marks omitted)); Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment regarding subdiv. (b), item (4) ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met

22

despite the diligence of the party seeking the extension"). "We review for abuse of discretion a district court's denial of a motion to amend a complaint after the scheduling order's deadline for amendments has passed." *Birch*, 812 F.3d at 1247.

The district court did not abuse its discretion in ruling that Plaintiff failed to show good cause. The proposed amended complaint sought to add a "claim under the Fourth Amendment alleging that Defendants acted unlawfully by conducting a comprehensive seizure [of] her cellular phone." Aplt. App., Vol. 2 at 430. The proposed amended complaint alleged that Plaintiff provided "limited consent to only download text messages related to the reported rape from her phone," but Defendants "proceeded to download all of the data and contents of Plaintiff's iPhone, which included phone recordings, contacts, call logs, device locations, Bluetooth devices, log entries, passwords, voicemails, voice memos, web search history, videos, music, photographic and other cached images." *Id.* at 519. Plaintiff's Fourth Amendment rights were therefore violated "when [Defendants] exceeded the scope of Plaintiff's expressly limited consent and conducted a warrantless search of her cell phone and unreasonably seized and downloaded all of its contents." *Id.* at 520.

Plaintiff's sole argument in support of good cause for the tardy amendment is that she "first learned in July 2023 through Detective Cottengim's deposition[ that] officers exceeded her limited consent[ by] accessing her entire phone." Aplt. Reply Br. at 10 (citing Aplt. App., Vol. 3 at 703–04). During that deposition Cottengim was played a recording of the conversation between Plaintiff and Nicholson in which Plaintiff consented to having officers download text messages. *See* Aplt. App., Vol. 3

at 703–04. He agreed that it was "wrong . . . to download the contents of the entire phone and then rummage around in there when consent was not given for that." *Id.* at 704. Plaintiff asserted in her motion for leave to amend that after the depositions she "immediately" hired an expert, John Mallery, "to determine the scope of the download and the search," but she "did not obtain the evidence of the cell phone download and areas searched from opposing counsel until September 5, 2023." Aplt. App., Vol. 2 at 446. Plaintiff served Mallery's first expert report on Defendants on September 29. *See id.* at 446. Plaintiff then requested a supplemental expert report, which was served on November 29, 2023. *See id.* at 446–47. Plaintiff did not move for leave to file the amended complaint until December 15, 2023. *See id.* at 430.

The magistrate judge denied leave to amend. *See Horocofsky v. City of Lawrence*, No. 20-2529-JWB-BGS, 2024 WL 340759, *1 (D. Kan. Jan. 30, 2024). Although there was evidence of earlier notice to Plaintiff of the extensive search of her phone, the magistrate judge gave her the benefit of the doubt and assumed that it was during the July 2023 depositions that she had first become aware that the entire contents of her phone had been downloaded. Nevertheless, the magistrate judge denied the motion because "Plaintiff could have, but did not, move to amend in July 2023, some five months prior [to] the filing of the . . . motion in December 2023." *Id.* at *8. Plaintiff objected to the denial, but the district court overruled the objections.

On appeal Plaintiff argues that she moved for leave to amend "less than five months after the deposition[ and] less than three months after discovering the full

extent of the abuse." Aplt. Br. at 42 (emphasis omitted). We can assume, as did the district court and magistrate judge, that Plaintiff was not on notice until the deposition. But Plaintiff provides no reason why she needed five months to seek amendment. *Cf. Birch*, 812 F.3d at 1248 (affirming denial of motion for leave to amend that was submitted four months after notice). At best, she showed that she needed two months (awaiting the expert report after the deposition) to "discover the full scope of the unlawful search." Aplt. Br. at 42. But she does not explain why she could not seek amendment without understanding the "full scope." Nor does she explain why she needed an additional three months after understanding that scope. Although she asserts that she "required a supplemental expert report" after "[c]onflicting testimony from defense witnesses," *id.*, she does not identify what this "conflicting testimony" was, *id.*, or why it "would impact bringing this claim." *Horocofsky*, 2024 WL 1961390, at *2.

The district court did not abuse its discretion in ruling that Plaintiff failed to demonstrate "good cause to amend [her] pleadings after the scheduling order deadline." *Gorsuch*, 771 F.3d at 1242.[9]

---

[9] Plaintiff also argues that the district court erred in failing to decide whether the amendment was justified under Fed. R. Civ. P. 15(a). "After a scheduling order deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking modification under [Rule 16] and (2) satisfaction of the Rule 15(a) standard." *Gorsuch*, 771 F.3d at 1240. But given our holding on Rule 16, "we need not reach the Rule 15(a) issue, and decline to do so." *Id.* at 1242.

### C.     Motion for Summary Judgment

In April 2024 Defendants moved for summary judgment on the remaining claims. The district court granted the motion. *See Horocofsky v. City of Lawrence*, 762 F. Supp. 3d 1068, 1098 (D. Kan. 2025).

We first address the equal-protection claim brought under § 1983 and then the state-law claims. We review "the grant of summary judgment de novo." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). Summary judgment may be granted "if there is no genuine dispute as to any material fact." *Id.* at 573 (internal quotation marks omitted).

### 1.     *Equal protection*

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provides "a direction that all persons similarly situated should be treated alike." *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1233 (10th Cir. 2009) (internal quotation marks omitted). Ordinarily, "plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Brown v. Montoya*, 662 F.3d 1152, 1173 (10th Cir. 2011) (internal quotation marks omitted). Similarly situated individuals "are alike in all relevant respects." *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (internal quotation marks omitted). And as with other components of § 1983 claims, plaintiffs must allege specific "facts about any particular person or persons who were treated differently," not rely on "conclusory allegations." *Brown*, 662 F.3d at 1173.

Plaintiff argues that officers did not investigate her allegations against Thompson similarly to how they investigated her for falsely reporting a rape. She says that officers quickly targeted her but not Thompson as a suspect, focused on her texts but not Thompson's, and disbelieved her but not Thompson.

But she does not show that she was similarly situated to Thompson in all relevant respects. The two were accused of different offenses. One imposed on the resources of law enforcement by initiating the investigation of the events (and then asked that the investigation be halted), while the other only responded to charges against him. One had been inconsistent in her account, while the other was not.

Alternatively, Plaintiff argues that her equal-protection claim can be "corroborate[d]" by LPD officers' poor treatment of sexual-assault survivors. Aplt. Br. at 51. She relies on the proposition that "[a]lthough there is no general constitutional right to police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988). But she has failed to produce evidence that the LPD discriminates against women in providing protection. She points to an affidavit filed by a woman alleging bias in police handling of her rape case. That prosecution was dropped, however, not because of any decision by the LPD but by the district attorney after rape charges had been filed and a judge had found probable cause at a preliminary hearing. And the victim did not complain that Nicholson was involved in the dismissal but only that Nicholson was abrasive and dismissive while investigating the allegations. Yet even

27

if Nicholson mistreated this victim, this says nothing about whether Nicholson treated this victim *worse* "than . . . other assault victims." *Id.*

Plaintiff also says that not long after she was charged, officers allegedly "'high-fived'" about catching "their 'false report' or 'liar.'" Aplt. App., Vol. 8 at 2177–78. But she acknowledges that *Defendants* were not among those officers.

Finally, Plaintiff argues that her equal-protection claim can be shown by circumstantial evidence and the "'totality of the relevant facts.'" Aplt. Br. at 47 (quoting *Fowler v. Stitt*, 104 F.4th 770, 784 (10th Cir. 2024), *cert. granted*, *judgment vacated*, 145 S. Ct. 2840 (2025)). She takes issue with the district court's "narrow[] focus[] on the absence of a similarly situated male comparator or statistical proof— despite well-established precedent holding that Equal Protection violations may be demonstrated through other means." Aplt. Br. at 45–46. The gist of her claim, however, is simply that Defendants believed Thompson rather than her and that Cottingim had used pejorative language relating to her credibility when he testified at his deposition. But unless no reasonable person could have disbelieved Plaintiff's account (an argument not made by Plaintiff), the fact alone that Defendants did not believe her is not enough to support a finding that their skepticism was the result of bias against women.[10]

---

[10] On appeal, Plaintiff also briefly argues that there was "compelling direct . . . evidence of gender bias." Aplt. Br. at 45. Although such evidence may be sufficient, *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000), Plaintiff waived any reliance on this argument by failing to raise it below, *see Bennett*, 258 F.3d at 1227, or developing it on appeal, *Becker*, 494 F.3d at 913 n.6.

Thus, even construing the record in Plaintiff's favor, we cannot say that the district court erred in granting summary judgment on her equal-protection claim.[11]

## 2.    *State-law claims*

In addition to her federal claims, Plaintiff brought state-law claims against the City and Defendants. Having original jurisdiction to hear the federal claims, the district court could exercise supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(a). But when "the district court has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction over a [supplemental] claim." 28 U.S.C. § 1367(c)(3). "The Supreme Court has encouraged the practice of dismissing state claims or [if the case had been removed from state court] remanding them to state court when the federal claims to which they are supplemental have dropped out before trial." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1238 (10th Cir. 2020). Although this is discretionary, we have said that courts "*should* decline the exercise of jurisdiction" in that circumstance. *Brooks*, 614 F.3d at 1229 (emphasis added) (internal quotation marks omitted). "[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary." *Id.* at 1230 (brackets and internal quotation marks omitted).

---

[11] The district court also held that Defendants were entitled to qualified immunity because Plaintiff did not demonstrate that any of her supposedly violated rights were clearly established. We need not address that issue.

29

When Defendants moved to dismiss, they asked the court to decline to exercise supplemental jurisdiction over the state-law claims. The district court did not do so, however, because it did not grant "the dismissal of *all* federal claims"; instead, it allowed the equal-protection claim to proceed to summary judgment. *Horocofsky*, 2022 WL 1421554, at *30. But it then granted summary judgment on that remaining federal claim. *See Horocofsky*, 762 F. Supp. 3d at 1098. At that point, "the federal claims" had "dropped out before trial." *Barnett*, 956 F.3d at 1238. The district court ordinarily should have declined to exercise its supplemental jurisdiction over the state-law claims. *See*, *e.g.*, *Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1086 (10th Cir. 2011); *Brooks*, 614 F.3d at 1229; *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995).

Because it does not appear from the record that the district court considered dismissing the state-law claims after it fully disposed of the federal claims, we reverse the disposition of the state-law claims for the district court to consider whether it should have declined to exercise its supplemental jurisdiction.

### III.    CONCLUSION

We **AFFIRM** the judgment below dismissing Plaintiff's federal claims. But we **REVERSE** the district court's grant of summary judgment as to the state-law claims and **REMAND** to the district court for further proceedings consistent with this opinion.